Filed 9/29/25  Protect Roseville Neighborhoods v. City of Roseville CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| PROTECT ROSEVILLE NEIGHBORHOODS et al., | C101428 |
| Plaintiffs and Appellants, | (Super. Ct. No. SCV0051108) |
| v. | |
| CITY OF ROSEVILLE et al, | |
| Defendants and Respondents; | |
| INTER-CAL REAL ESTATE CORPORATION, | |
| Real Party in Interest and Respondent. | |

This case involves the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] which seeks to ensure that public agencies consider the environmental consequences of the discretionary projects they propose to carry out or approve. (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 488.) For policy reasons, the Legislature has expressly exempted several categories of projects from environmental review under CEQA, including "Class 32," which comprises "in-fill" projects, i.e., development projects that occur within city limits on no more than five acres substantially surrounded by urban uses and that meet other specified conditions. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1092 (*Berkeley Hillside*); see *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380-381 [if a project is exempt from CEQA, no further environmental review is necessary; the public agency need only prepare and file a notice of exemption].)

Protect Roseville Neighborhoods (Protect Roseville) and Paseo Del Norte Homeowners Association (collectively, plaintiffs)[2] appeal from the denial of their verified petition for a writ of mandate, which challenged the approval of a commercial development project in northeast Roseville that includes (among other things) the construction of a 16,000 square foot Grocery Outlet store and a tentative parcel map subdividing an existing parcel into three separate lots (or parcels). Plaintiffs contend the

---

[1] Undesignated statutory references are to the Public Resources Code.

[2] Protect Roseville is an unincorporated association with the "mission" to protect and enhance the environment and community in the City of Roseville. Paseo Del Norte Homeowners Association is a non-profit mutual benefit, common interest development corporation. The members of these entities live, work, and/or recreate in the areas that will be impacted by the project at issue in this case.

City of Roseville and the City Council of the City of Roseville (collectively, the City)[3] failed to evaluate the entire project and provide an adequate project description regarding the future development of "Parcel 3," which, in the original project application, included the construction of a fast-food restaurant with a drive-through.[4] Plaintiffs argue that reversal is required because although the immediate commercial development of Parcel 3 was "omitted" from the project, the subdivision of Parcel 3 was a part of the approved project and "the whole of the action," and therefore the City improperly segmented environmental review for this foreseeable use in violation of CEQA's prohibition against "piecemealing." Plaintiffs further contend the City erred in determining the project was categorically exempt from CEQA under the in-fill (or Class 32) development exemption set forth in the CEQA Guidelines,[5] which required (among other things) a finding that the project would not result in any significant effects relating to traffic, noise, air quality, or

---

[3] The defendants in this case are the City of Roseville and the City Council of the City of Roseville. The City of Roseville is the "lead agency" for purposes of the project. (See § 21067 [defining "lead agency" to mean "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment"].) The city council was the legislative body responsible for approving or denying the project.

[4] This restaurant is sometimes referred to as a quick-service restaurant (or QSR) with a drive-through. In this opinion, we refer to it as the fast-food restaurant. All references to a fast-food restaurant are to a fast-food restaurant with a drive-through.

[5] All references to "Guidelines" are to the CEQA Guidelines in title 14 of the California Code of Regulations, which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) The Guidelines specify "classes" of projects that are categorically exempt from CEQA review, including Class 32, which consists of projects characterized as in-fill development meeting certain conditions. (Guidelines, § 15332; *Pacific Palisades Residents Assn., Inc. v. City of Los Angeles* (2023) 88 Cal.App.5th 1338, 1364 [the Class 32 categorical exemption is sometimes called "the in-fill development projects exemption"].)

water quality. According to plaintiffs, the project is subject to CEQA review because it will have significant traffic-related safety impacts affecting area residents.

As we will explain, we disagree with plaintiffs' contentions. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Project*

The project involves the construction of a 16,000 square-foot Grocery Outlet store and a 4,600 square-foot freestanding pad building for retail stores. The project also includes a tentative parcel map to subdivide the existing parcel into three separate lots, known as Parcels 1, 2, and 3. The Grocery Outlet will be located on Parcel 1 and the freestanding pad building will be located on Parcel 2. Although the owner of the project--real party in interest, Inter-Cal Real Estate Corporation (Inter-Cal)--originally proposed to build a fast-food restaurant on Parcel 3, that proposal was withdrawn (via a modified permit application) after City staff determined that the findings required to approve permits for such use (including a conditional use permit) could not be made and the project would not qualify for the in-fill development exemption with that proposed use. As a result, the proposed project included an undeveloped parcel (Parcel 3), which could ultimately be developed for a variety of commercial uses (e.g., food and beverage retail sales, bar, pet store) in accordance with the applicable community commercial zoning designation. However, any future development of Parcel 3 would require a new design review permit that evaluated the site plan and building elevations. If that future development included the construction of a fast-food restaurant, a conditional use permit would also be required "due to the proximity [of the restaurant] to residential uses." Neither of these permits can be issued without further CEQA review.

*The Project Site*

The North Roseville Specific Plan (NRSP) was adopted in 1997 and consists of a three-phase, comprehensive specific plan spanning more than 1,500 acres of land. It

4

includes five distinct neighborhoods (A, B, C, D, E), with a mix of residential neighborhoods, schools, parks, and supporting land uses. An EIR was prepared for the NRSP in 1997 for Phase 1. It was subsequently augmented in 1999 and 2000 with EIRs for Phases 2 and 3.

The project site--1751 Pleasant Grove Boulevard--is located on the northern boundary of neighborhood D. The site is approximately 3.1 acres on a parcel known as WW-40, which has a land-use designation of community commercial. The NRSP's intended uses for WW-40 are "smaller retail shops and services targeted to the surrounding neighborhoods" and/or professional and service office uses, such as travel, insurance and real estate services. Section 19.12.020 of the Roseville Municipal Code lists the various permitted land uses for areas zoned as community commercial. Among the more than 50 allowable land uses are a fast-food restaurant, food and beverage retail sales, full service eating and drinking establishments, retail sales and services, and lodging services. (Roseville Municipal Code § 19.12.020.)[6]

The neighboring parcel to the east of the project site, parcel WW-41, includes a single-family residential subdivision, the 125-unit Paseo Del Norte development, which has a land-use designation of medium-density residential.[7] The proposed project includes several pedestrian pathways and connections, including a pathway that connects parcel WW-41 (the subdivision) to parcel WW-40 (the project site), as it was expected that

---

[6] We granted the City and real party in interest's (Inter-Cal) request to take judicial notice of this ordinance.

[7] In 2006, the land-use map and text of the NRSP was amended to change the zoning of parcel WW-41 (the Paseo subdivision) from a land-use designation of community commercial to medium-density residential. In approving these changes, the city council found that medium-density residential use was "consistent with the adopted City of Roseville General Plan" and was "conducive to public health, safety, and welfare and consistent with the land use practices of the City."

residents of the subdivision would use the goods and services provided by the commercial development of the site.

As for the other area surrounding the project site, there are open space parcels containing the Western Area Power Administration power line corridor to the south, an existing CVS Pharmacy to the west, and an undeveloped community commercial parcel across Pleasant Grove Boulevard to the north.

In 2020, the City of Roseville adopted the 2035 General Plan. Of relevance here, the transportation section analyzed the effects to the transportation system, which included an updated traffic analysis that considered a vehicle miles traveled (VMT) metric in accordance with newly enacted legislation surrounding traffic impacts on CEQA review. (See Guidelines, § 15064.3, subd. (a) [VMT, which "refers to the amount and distance of automobile travel attributable to a project," is generally "the most appropriate measure of transportation impacts"].) The portion of the transportation section addressing VMT explained that future projects consistent with the 2035 General Plan would not require further VMT analysis, "pursuant to the tiering provisions of CEQA."

*Project Application*

In June 2022, Inter-Cal applied for a design review permit and a tentative parcel map subdividing WW-40 into three lots (or parcels).[8] Inter-Cal proposed that Parcel 1 (1.9 acres) would be a 16,000 square-foot Grocery Outlet store, Parcel 2 (0.6 acres) would be a 4,600 square-foot freestanding pad building for retail stores, and Parcel 3 (0.6 acres) would be a 2,600 square foot fast-food restaurant. Inter-Cal's application included traffic study and a noise study. The traffic study, completed by Fehr & Peers (a national consulting firm specializing in transportation planning and engineering), analyzed the

---

[8] The application was submitted by Norr Architects on behalf of Inter-Cal.

6

proposed project's impacts on turning movements and traffic queueing on the existing roadways. While the traffic study considered the existence of a fast-food restaurant on Parcel 3, the analysis was undertaken with the understanding that the construction of such a restaurant was not part of Inter-Cal's application for a design review permit. Thus, it was understood that a supplemental analysis of the layout and traffic circulation would be required if Inter-Cal applied for a permit to build a fast-food restaurant on Parcel 3. The study provided three recommendations to assist with project access and on-site circulation, but it did not independently analyze VMT. Because the noise study is not relevant to the issues raised on appeal, we note only that its analysis considered a fast-food restaurant and concluded that the resulting noise levels would comply with the "City of Roseville noise level standards."

In February and March 2023, public meetings were held for the purpose of allowing community members to provide feedback about the proposed project. At these meetings, residents of the subdivision expressed concerns about traffic safety related to additional vehicles using Camino Real Way--a private road that bisects the subdivision and connects it to the adjacent project site. Further, during the time period between the public meetings, it was discovered that there was an easement that allowed residents of the subdivision to access the project site but would not allow non-residents to use the easement to enter the subdivision via Camino Real Way.

In early May 2023, City staff issued a report addressing the project application and the traffic-related safety concerns raised by area residents during the public meetings. Although the report expressly stated that there would be no development of Parcel 3, it also included language in Condition of Approval #4 indicating that a fast-food restaurant would be built on that parcel. City staff also prepared a memorandum for the planning commission that responded to a letter submitted by Protect Roseville, which relied on the traffic and noise studies to argue that the City could not rely on in-fill development exemption due to significant effects to traffic and noise that would be caused by the

7

"unusual circumstance" of placing a fast-food restaurant adjacent to an existing neighborhood. The City staff memorandum explained that the traffic study prepared by Fehr & Peers contemplated a "worst case scenario" because it was conducted before the construction of a fast-food restaurant on Parcel 3 was withdrawn from the project application, and only analyzed short-term effects, such as turning movements and queuing, which are not impacts under CEQA. The memorandum further explained that VMT was the required transportation analysis under CEQA, and that no further environmental review of VMT was necessary because the proposed project was consistent with the 2035 General Plan land-use designation (community commercial), and therefore consistent with the citywide analysis of VMT included in the EIR for the 2035 General Plan.

On the same day as the City staff report and memorandum were issued, the planning commission held a public hearing on the proposed project. During that hearing, there was evidence that no development was currently planned for Parcel 3, as the proposal to build a fast-food restaurant was withdrawn from the project application, and that the construction of any such restaurant in the future would require a conditional use permit. In addition, residents of the subdivision raised concerns about traffic safety, parking, noise, and emergency access related to an increase in vehicles using Camino Real Way as a result of the project. Traffic safety concerns related to an increase in use of the access easement were also raised.

*Planning Commission and City Council Review*

At the conclusion of the hearing, the planning commission unanimously approved the project, subject to numerous conditions, including a requirement that Inter-Cal install a speed bump on Camino Real Way and a sign indicating that the road was private and could only be used by residents of the subdivision. In approving the project, the planning commission determined that it was categorically exempt from CEQA's environmental review requirements under Guidelines section 15332, which concerns the development of

8

in-fill projects.  As noted *ante*, "in-fill" refers to construction in areas that are already largely developed.  (See Guidelines, § 15332, subd. (b) [among other requirements, projects subject to the in-fill exemption must be "substantially surrounded by urban uses"].)  Here, it is not disputed that the project site is located in an area surrounded by urban uses.

In mid-May 2023, Protect Roseville appealed the planning commission's decision to the city council, which focused on concerns related to the development of a fast-food restaurant on Parcel 3.  Among other things, Protect Roseville again argued that the in-fill development exemption did not apply due to "unusual circumstances" because there would be significant transportation impacts from increased traffic as a result of the development of a fast-food restaurant on Parcel 3.

In July 2023, plaintiffs sent a letter to the city council highlighting their specific concerns with the proposed project.  Among other things, they claimed environmental review under CEQA was improperly piecemealed because there was no analysis of the future development of Parcel 3, the project description was inadequate because Parcel 3 was part of the project but City staff claimed it was removed from the project, and the project did not qualify for the in-fill development exemption because the construction of a fast-food restaurant adjacent to an existing residential subdivision constituted an "unusual circumstance" precluding application of the exemption.

City staff prepared a written response to the appeal; it stated that while it was *not* reasonably foreseeable Parcel 3 would be developed with a fast-food restaurant because "staff could not support such a proposal," it was reasonably foreseeable that the parcel could be developed with "other use types" allowed for a parcel zoned as community commercial.  City staff explained that because the project application did not include a specific proposal for the development of Parcel 3, discussion of this parcel was included as part of the tentative parcel map evaluation rather that the design review permit

9

evaluation, which (in the City's view) did not result in improper piecemealing of environmental review.

City staff went on to explain as follows: "Programmatic evaluation of site development consistent with [community commercial] land use designation was already completed as part of the [NRSP EIR]. The project is located on Specific Plan Parcel WW-40 in the [NRSP]. The [EIR] analyzed the impacts of full development of the entirety of Parcel WW-40 with commercial uses, including the project site. The creation of an additional parcel within the same site does not require further CEQA review, as there are no specific or peculiar project-level effects of a commercial parcel map. Furthermore, the EIR assumed Community Commercial parcels would develop at a Floor Area Ratio of 0.30, which for this 3.1-acre project site would be approximately 40,500 square feet of building area. The proposed project includes approximately 20,600 square feet of building area, and thus is significantly less intensive than the assumptions of the programmatic analysis.

"Development of commercial parcels commonly happens in phases over time, and often includes remainder parcels. In 2010, as part of the application for the CVS developed on the western portion of parcel WW-40, the CVS project included a parcel map which created an undeveloped eastern parcel. Like the current project, the CEQA review for the CVS project focused on the potential effects of developing the CVS and did not provide further discussion of the remainder parcel because there was no project-level proposal to evaluate. Thirteen years later, the Grocery Outlet is proposed and CEQA review has been completed for the project. Parcel 3 is a remainder parcel with no specific development proposal at this time, and therefore no project specific analysis is possible for Parcel 3; the programmatic CEQA analysis of the EIR is sufficient. It is certainly not prudent to analyze Parcel 3 as a future drive-through restaurant, which staff explicitly told the applicant they could not support."

10

As for whether there were "unusual circumstances" precluding application of the in-fill development exemption, the City staff memorandum stated: "The appellant [claims] that there is an unusual circumstance in the project that does not allow for a CEQA infill exemption. They allege that '[i]n the present case, the unusual circumstance is the placement of a fast-food restaurant adjacent to an existing neighborhood.' As discussed above, there is clearly no fast-food restaurant proposed or a reasonable possibility that one is proposed, given that there is no Conditional Use Permit associated with the project and no drive-through is shown on any of the project plans. There are no unusual circumstances as described by the appellant associated with this Project."

As for the purported inconsistent (or inadequate) project description, City staff acknowledged that its May 2023 staff report (prepared for the hearing before the planning commission) erroneously indicated in Condition of Approval #4 that a fast-food restaurant would be built on Parcel 3. City staff explained that this error did not create an unstable project description, as "[t]he commission staff report, project plans, memo to planning commission, planning commission presentation and city council staff report are clear on the scope of the project," which includes a request for a design review permit to construct two buildings--a 16,000 square-foot grocery store (Grocery Outlet) and a 4,600 square-foot freestanding pad building--and a request for a tentative parcel map to subdivide the existing parcel into three lots (or parcels).

Prior to the appeal hearing, City staff prepared a memorandum for the city council, which recommended denying plaintiffs' appeal, adopting various findings of fact, and imposing numerous conditions of approval. As for the traffic-related safety concerns raised by area residents, the City staff memorandum stated: "Residents' concerns in relation to traffic were largely around access to the Paseo del Norte site from the commercial site. The concern was that additional vehicles will use the private road, Camino Real Way, that bisects the community and will have safety impacts to children in the area as well as parking impacts. These concerns were also brought up at the two

11

neighborhood meetings held for the project. While staff does not believe that Camino Real Way is a likely egress route for customers of the commercial center, conditions of approval 10a and 28 were added before the Planning Commission meeting to address these concerns and further deter use of the private road by non-residents of the [homeowners association]." The conditions of approval referenced in the memorandum included the requirement that Inter-Cal install a speed bump on Camino Real Way and a sign indicating that the road is private and cannot be used by non-residents.

*Project Approval and Notice of Exemption*

In July 2023, after a hearing in which area residents raised concerns related to traffic, the city council unanimously adopted Resolution No. 23-309, denying the appeal submitted by Protect Roseville and approving the project with numerous conditions of approval. The approval was subject to several amendments, including (as relevant here) an amendment clarifying that any future development of Parcel 3 would require a new design review permit, and an amendment removing the reference to a fast-food restaurant that appeared in Condition of Approval #4.[9]

The next day, the City of Roseville filed a notice of exemption under section 21152, stating that the project was categorically exempt from CEQA's environmental review requirements pursuant to the in-fill development exemption under Guidelines section 15332. The notice of exemption described the project as follows: "On July 19, 2023, the City Council denied the appeal of the Planning Commission's decision and

---

[9] Condition of Approval #4 stated: "The project shall be addressed as 1751 Pleasant Grove Bl. *The address for proposed Parcel 3, and building 'QSR' [(i.e., fast-food restaurant)] on said parcel, shall be addressed 1741 Pleasant Grove Dr*. Parcel 2, and the building 'SHOPS' on said parcel, shall be addressed as 1749 Pleasant Grove Bl. The address for Parcel l, and the GROCERY OUTLET building on said parcel, shall be 1755 Pleasant Grove Bl. All projects with multi-tenants or buildings must submit a site plan with building footprint(s) to the Development Services Department (Business Services - Addressing) for building/suite addressing. (Business Services)." (Italics added.)

12

approved a Design Review Permit to construct a 16,000 square-foot grocery building and a 4,600 square-foot freestanding pad building. The request also included a Tentative Parcel Map to subdivide the existing parcel into three (3) lots."

After identifying the five criteria that must be met in order for the in-fill development exemption to apply, the notice of exemption stated: "The project meets these criteria for the following reasons and is therefore exempt. (a) The General Plan land use designation of Community Commercial and the Zoning designation of Community Commercial allows for this commercial development. (b) The total project site is 3.1 acres and is substantially surrounded with urban development, including a commercial use to west and a residential community to the east. (c) The project site has been previously disturbed including, discing and paving, and does not contain habitat for endangered, rare or threatened species. (d) The proposed use will not have significant effects on traffic (as provided in the traffic study), noise (as provided in the noise study), air quality (due to minimum screening thresholds per the PCAPCD), or water quality. (e) Based on a review by the City's utility departments, the site can be adequately served by all required utilities and public services allocated to the site."

*Verified Petition for Writ of Mandate and Complaint*

In August 2023, plaintiffs filed a verified petition for writ of mandate and complaint for declaratory and injunctive relief against the City, which sought (among other things) an order vacating the City's approval of the project. Plaintiffs alleged one cause of action under CEQA, which was predicated on the City's impermissible piecemeal environmental review (i.e., the City's failure to evaluate the "whole of the action" by failing to conduct environmental review for the development of Parcel 3 and the reasonably foreseeable uses of that parcel), the City's failure to adequately describe the proposed project by providing an inconsistent and incomplete project description regarding Parcel 3, and the City's erroneous determination that the project was categorically exempt from CEQA under the in-fill development exemption.

13

As for the in-fill development exemption, plaintiffs asserted that it did not apply due to the "unusual circumstances" exception because the proposed project would result in "significant effects to noise and traffic," "[g]iven the piecemeal environmental review and the ambiguous and uncertain Project description regarding whether a [fast-food restaurant] is part of the Project." In this regard, the theory expressed in the petition differed from that expressed during the administrative proceedings, during which, as outlined *ante*, plaintiffs asserted that the unusual circumstances were the placement of a fast-food restaurant adjacent to a residential subdivision. In their briefing in the trial court, plaintiffs suggested that the unusual circumstance was the "significant impact to traffic safety on the private road that passes through Paseo del Norte" and argued that "[t]he project also involves unusual circumstances as the City states that Parcel 3 is not part of the Project but then includes approvals that benefit the development of Parcel 3." In their reply brief, plaintiffs offered that "[a] subdivision with a private road that provides ingress and egress to the commercial center constitutes an unusual circumstance in this Project."

*Trial Court's Ruling and Appeal*

In May 2024, after a hearing, the trial court issued a detailed written order denying plaintiffs' verified petition for writ of mandate. Plaintiffs timely appealed. The matter was fully briefed and assigned to this panel in April 2025.

**DISCUSSION**

I

*Description of the Project and Piecemeal Environmental Review*

Plaintiffs argue the City inadequately described the project by failing to account for future development that is a reasonably foreseeable consequence thereof-- construction of a fast-food restaurant on Parcel 3. As a result, plaintiffs claim the City improperly segmented environmental review of the project by not evaluating "the whole of the action," which (in their view) includes the future development of Parcel 3. In other

14

words, plaintiffs argue the City impermissibly piecemealed the approval of the project by failing to analyze the reasonably foreseeable future development that would occur as a consequence of the project.

A. *Relevant Legal Principles and Standard of Review*

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.) It "was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382; see also *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285-286.)

"In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. [Citations.] CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Mountain Lion Foundation v. Fish & Game Com.*, *supra*, 16 Cal.4th at p. 112; see *Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 711 ["CEQA embodies a central state policy to require state and local governmental entities to perform their duties 'so that major consideration is given to preventing environmental damage' "].)

"CEQA prescribes how governmental decisions will be made whenever an agency undertakes, approves, or funds a project." (*Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 488 (*Protecting Our Water*).) With narrow exceptions, CEQA requires an Environmental Impact Report (EIR)

15

whenever "a public agency proposes to approve or to carry out a project that may have a significant effect on the environment."  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights*); see *id*. at pp. 390, 392 [at the "heart of CEQA" is the requirement that public agencies prepare an EIR for any "project" that "may have a significant effect on the environment"].)  "The purpose of an EIR is to inform the agency and the public, in detail, about the effect the project is likely to have on the environment and the ways available to minimize that impact." (*Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165, 184-185; see *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447 ["The fundamental goal of an EIR is to inform decision makers and the public of any significant adverse effects a project is likely to have on the physical environment"].)[10]

" 'Project' is a term of art.  'CEQA broadly defines a "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and . . .  [¶]  . . .  [¶]  . . . that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."  [Citation.]  [¶]  The statutory definition is augmented by the Guidelines [citation], which define a "project' as "*the whole of an action*, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." ' "  (*Banning Ranch Conservancy v. City of Newport Beach* (2012)

---

[10]  An EIR " 'must include a description of the proposed project and its environmental setting and discussions of (1) the possible environmental effects of the project, (2) feasible measures to mitigate any significant, adverse environmental effects of the project, (3) the comparative environmental effects of a range of reasonable alternatives to the proposed project, including a 'no project' alternative, and (4) the cumulative impact of the project's various environmental effects.' "  (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 627.)

211 Cal.App.4th 1209, 1220 (*Banning Ranch*); *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 277; see *County of Amador v. City of Plymouth* (2007) 149 Cal.App.4th 1089, 1099, 1104, 1100 & fn. 10 [the term "project" refers to " 'the whole of an action'" affecting the environment and " 'is given a broad interpretation in order to maximize protection of the environment' "].)

Environmental review of a project under CEQA must encompass the whole of an action affecting the environment. (Guidelines, § 15378, subd. (a); *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 369-370.) " 'CEQA forbids "piecemeal" review of the significant environmental impacts of a project.' " (*Banning Ranch, supra*, 211 Cal.App.4th at p. 1222; *Planning & Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 751; see also *McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 84 [improper piecemealing occurs when "an agency . . . split[s] a project into separate segments to avoid consideration of the cumulative environmental impacts of a project"].) Our Supreme Court established a piecemealing test in *Laurel Heights* as follows: A public agency must include an analysis of the environmental effects of future expansion or other action if: "(1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights, supra*, 47 Cal.3d at p. 396 [absent these two circumstances, the future expansion need not be considered].) As explained by our high court: "This standard is consistent with the principle that 'environmental considerations do not become submerged by chopping a large project into many little ones -- each with a minimal potential impact on the environment -- which cumulatively may have disastrous consequences.' [Citation.] The standard also gives due deference to the fact that premature environmental analysis may be meaningless and financially wasteful." (*Ibid*.)

17

"The project definition is the starting point of a piecemealing challenge, not the finish line.  The whole question is whether the project definition is correct."  (*Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1223.)  A project description must be accurate, stable, and finite.  (*City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438, 1454.)  If the project description is inadequate, the environmental impact analysis likely will be inadequate, too.  (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 734; see *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 ["An accurate project description is necessary for an intelligent evaluation of the potential environmental effects of a proposed activity"], disapproved of on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570 & fn. 2; *McQueen*, at p. 1144 ["A narrow view of a project could result in the fallacy of division [citation], that is, overlooking its cumulative impact by separately focusing on isolated parts of the whole"].)

Improper piecemealing occurs when the purpose of the proposed project is to be the first step toward future development but the public agency fails to conduct environmental review for that development/expansion.  (*Banning Ranch, supra*, 211 Cal.App.4th at p. 1223; see, e.g., *Laurel Heights, supra*, 47 Cal.3d at p. 398 [EIR set aside for failing to analyze impacts of second phase of multi-phased project where university planned to occupy entire building eventually]; *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 244 [county rezoned land as "a necessary first step to approval of a specific development project"]; *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1337 [negative declaration wrongly issued; "the sole reason" city approved road and sewer construction was "to provide a catalyst for further development"].)  There may also be improper piecemealing when the proposed project legally compels or practically presumes completion of another action.  (*Banning Ranch,* at p. 1223; see, e.g., *Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 272 [EIR for reclamation plan should have included mining operations that

18

necessitated it]; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra,* 27 Cal.App.4th at p. 732 [EIR for residential development should have included sewer expansion that was a "crucial element[ ]" of development]; *Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726 [shopping center, parking lot, and adjacent road widening "should be regarded as a single project"].)

By contrast, no improper piecemealing occurs, meaning two projects may properly undergo separate environmental review by a public agency, "when the projects have different proponents, serve different purposes, or can be implemented independently." (*Banning Ranch,* at p. 1223; see, e.g., *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 99 [the upgrade of a refinery and construction of pipeline exporting excess hydrogen were "independently justified separate projects with different project proponents"]; *Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 237 [water transfer had "significant independent or local utility" from a broader water supply agreement, and would be implemented with or without the supply agreement]; *Sierra Club v. West Side Irrigation Dist*. (2005) 128 Cal.App.4th 690, 699-700 [two water rights assignments to city were "approved by different independent agencies" and "could be implemented independently of each other"]; *Plan for Arcadia, Inc. v. City Council of Arcadia, supra*, 42 Cal.App.3d at p. 724 [shopping center EIR could exclude road work which the city had "long before" decided would be needed due to the construction of a new freeway].)

We independently determine whether a public agency reviewed a proposed project in piecemeal fashion. (*Banning Ranch, supra*, 211 Cal.App.4th at p. 1224.)

B. *Analysis*

We see no improper segmentation, or piecemealing, of environmental review in violation of CEQA here. Our first question is whether the construction of a fast-food restaurant on Parcel 3 of the project site is "a reasonably foreseeable *consequence* of the initial project." (*Laurel Heights, supra*, 47 Cal.3d at p. 396, italics added.) As we have

19

discussed, the approved project includes the subdivision of an existing parcel (with a land-use designation of community commercial) into three separate lots (or parcels), and the construction of a 16,000 square-foot Grocery Outlet store on Parcel 1, the construction of a 4,600 square-foot freestanding pad building for retail stores on Parcel 2, and no development on Parcel 3. Although it is anticipated that Parcel 3 will be developed in the future for some commercial use, it is not clear that any development would involve the construction of a fast-food restaurant. On this record, the construction of this type of restaurant on Parcel 3 is entirely speculative. Indeed, the proposal to build such a restaurant was withdrawn by the owner of the project after City staff determined that the findings required to approve such use could not be made.

We find unpersuasive plaintiffs' contention that the City's failure to conduct environmental review for a fast-food restaurant on Parcel 3 violated CEQA's prohibition against piecemealing. The record does not support the conclusion that this use of Parcel 3 is a reasonably foreseeable consequence of the project under review. The development of Parcels 1 and 2 are not the first step towards the development of Parcel 3, let alone the construction of a fast-food restaurant on that parcel. Nor does the approved development of Parcels 1 and 2 "legally compel" or "practically presume" the development of a fast-food restaurant or any other commercial establishment on Parcel 3, such that the development of all three parcels should be regarded as a single project. The construction of a fast-food restaurant on Parcel 3 is not a crucial functional element or integral part of the development of Parcels 1 and 2 such that, without it, the construction of the commercial buildings on those parcels could not proceed.

In our view, the circumstances here are analogous to cases rejecting piecemealing claims on the ground that future actions were too speculative. (See, e.g., *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1361 [airport EIR could omit future projects that "existed only as concepts in long-range plans that were subject to constant revision"]; *National Parks and Conservation Assn. v.*

20

*County of Riverside* (1996) 42 Cal.App.4th 1505, 1518-1519 [landfill EIR could omit detailed analysis of processing plants because "it is not known where [the plants] will be situated and who will be operating them"]; *Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712, 736-737 [highway EIR could omit detailed analysis of "anticipated," but "still contingent," expansion], disapproved on another ground in *Western States Petroleum Assn. v. Superior Court*, *supra*, 9 Cal.4th at p. 576, fn. 6.) Plaintiffs, for their part, have not persuasively articulated how and why the development of Parcel 3 cannot be implemented independently from the development of Parcels 1 and 2. In other words, plaintiffs have not shown why the development of Parcels 1 and 2 may not properly undergo separate environmental review under CEQA.[11] In any event, even

_____

[11] Contrary to plaintiffs' contention, *Laurel Heights* does not compel a finding that the future development of a fast-food restaurant on Parcel 3 is a reasonably foreseeable consequence of the approved project. The circumstances presented here are distinguishable from the situation in *Laurel Heights*. The project in *Laurel Heights* was defined in the EIR as " 'mov[ing] the School of Pharmacy basic science research units from the [University of California, San Francisco (UCSF)] Parnassus campus to Laurel Heights.' " (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 389, 393.) The building at Laurel Heights (purchased by the Regents of the University of California in 1985) consisted of approximately 354,000 square feet, of which only 100,000 was then available for relocation of the UCSF School of Pharmacy research units. The rest of the building was occupied by the California Department of Transportation under a lease that was to expire in 1990, with an option for an additional five years. (*Id*. at p. 393.) The EIR did not discuss the additional environmental effects, if any, that would result from UCSF's use of the remaining 254,000 square feet when it becomes available. (*Ibid*.)

In *Laurel Heights*, evidence that future expansion was "reasonably foreseeable" included an acknowledgment in the draft EIR that UCSF would occupy the entire facility when the remaining 254,000 square feet became available. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396, see also pp. 393, 397.) UCSF's plans were sufficiently definite that it estimated the number of faculty, staff, and students who would occupy the building before and after the expansion. (*Id*. at p. 396.) The final EIR also referred to the future expansion as a certainty, as did newsletters, minutes of the planning committee, and correspondence between the pharmacy dean and the chancellor. These documents also described with specificity how the additional space would be used. (*Id*. at p. 397.) The *Laurel Heights* court concluded: "In short, there is telling evidence that [UCSF], by the

21

assuming that the first prong of the *Laurel Heights* piecemealing test has been satisfied, plaintiffs, as we next explain, have failed to demonstrate that the second prong has been met.

Plaintiffs have made no effort to show that the future development of Parcel 3 will be significant in that it will likely change the scope or nature of the development of Parcels 1 and 2 or the environmental effects from that development. (*Laurel Heights, supra*, 47 Cal.3d at p. 396.) In their opening brief, plaintiffs do not provide any legal analysis directly addressing this prong of the *Laurel Heights* test, including any explanation as to how the future development of Parcel 3 will likely change the environmental effects of the initial project, which is the development of Parcels 1 and 2.[12] And, in any event, the record supports the conclusion that any future commercial development of Parcel 3 will not change the scope or nature of the environmental effects from the development of Parcels 1 and 2. As City staff explained in response to the appeal of the planning commission's decision to approve the project: "Programmatic evaluation of site development consistent with [community commercial zoning] designation was already completed as part of the [NRSP EIR]. The project is located on

_____

time it prepared the EIR, had either made decisions, or formulated reasonably definite proposals as to future uses of the building. At a minimum, it is clear that the further expansion and the general types of future activity at the facility are reasonably foreseeable." (*Ibid*.) In reaching this conclusion, the court specifically noted that "*[t]his is not the type of situation where it is unclear as to whether a parcel of land will be developed* or as to whether activity will commence." (*Id*. at p. 396, italics added [explaining that there was "no doubt . . . there will be future use"].)

[12] In the introduction section of their reply brief, plaintiffs assert, without further elaboration or explanation, as follows: "Contrary to Respondents' assertions and arguments the development of Parcel 3 is a reasonably foreseeable consequence of the initial project *and the future development of Parcel 3 will likely change the scope and nature of the initial project and its environmental effects*." (Italics added.) We need not and do not consider this undeveloped argument. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655-656 [arguments unsupported by legal authority and factual analysis may be deemed forfeited].)

22

Specific Plan Parcel WW-40 in the [NRSP]. The [EIR] analyzed the impacts of full development of the entirety of Parcel WW-40 with commercial uses, including the project site. The creation of an additional parcel within the same site does not require further CEQA review, as there are no specific or peculiar project-level effects of a commercial parcel map. Furthermore, the EIR assumed Community Commercial parcels would develop at a Floor Area Ratio of 0.30, which for this 3.1-acre project site would be approximately 40,500 square feet of building area. The proposed project includes approximately 20,600 square feet of building area, and thus is significantly less intensive than the assumptions of the programmatic analysis."

Contrary to plaintiffs' suggestion, *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, does not support a different result. There, the public agency approved a proposed shopping center development by dividing two related portions of the project--(1) a general plan amendment and zone reclassification, and (2) a tentative tract map approval and road abandonment--into two projects. The agency then environmentally reviewed the " 'two projects' " separately and adopted separate negative declarations (no EIR required) for each. (*Id.* at pp. 165-166.) In reversing, the appellate court stated: "This approach is inconsistent with the mandate of CEQA that a large project shall not be divided into little ones because such division can improperly submerge the aggregate environmental considerations of the total project." (*Id.* at p. 167 [concluding that the purposes of CEQA were subverted because the lead agency never considered whether the environmental effects of the total shopping center project, properly defined, were significantly adverse and thus required an EIR].)

Here, by contrast, the record reflects that the City environmentally reviewed one project. The mere fact that the City contemplates further commercial development at the project site is not sufficient to conclude that a fast-food restaurant on Parcel 3 is a

23

"reasonably foreseeable" consequence of the approved project.[13]  In short, this is not the type of case that implicates the concerns underlying CEQA's prohibition against piecemealing of environmental review.  The commercial development project at issue here was not segmented to avoid consideration of its cumulative environmental impacts.  Indeed, as explained by City staff in the proceedings below, programmatic evaluation of site development consistent with community commercial land use designation was already completed as part of the NRSP EIR, which analyzed the impacts of full development of the entirety of the project site with commercial uses.  Plaintiffs, for their part, provide no reasoned legal analysis, supported by citation to pertinent authority, convincing us that a contrary result is required.

We thus reject plaintiffs' contention that the City inadequately described the project by failing to account for future development that is a reasonably foreseeable consequence of the project--construction of a fast-food restaurant on Parcel 3.  We also reject plaintiffs' related contention that improper segmentation or piecemealing of

---

[13]  In support of their contention that improper piecemealing occurred, plaintiffs assert that the commercial development of Parcel 3 is a future phase of the approved project, since the planning commission's findings state that the project includes the grading and drainage required for the development of the *parcels*, which (in plaintiffs' view) includes grading and drainage of Parcels 1, 2, *and 3*.  But the portions of the record plaintiffs rely upon do not clearly show that grading and drainage of Parcel 3 is part of the approved project.  And, in any event, plaintiffs have failed to cite any authority convincing us that such work on Parcel 3 supports the conclusion that the construction of a fast-food restaurant on Parcel 3 is a reasonably foreseeable *consequence* of the initial project--the creation of three separate parcels at the project site and the commercial development of Parcels 1 and 2.  (See *Banning Ranch, supra*, 211 Cal.App.4th at pp. 1223, 1225 [while improper piecemealing may occur when the purpose of the activity at issue is to be the first step or to provide a catalyst toward future development, courts have distinguished these "first step" cases where the project under consideration is only a baby step toward another project]; see *id*. at pp. 1225-1226 [concluding that an access road to a park was "only a baby step toward [a housing] project" that would use the same access road and certainly "a much smaller step than the reviewed actions in the 'first step' cases"].)

environmental review occurred because the City did not evaluate the "whole of the action" by failing to consider the future development of a fast-food restaurant thereon.

## II

### *In-fill Development Exemption*

Next, plaintiffs argue the City erred in determining that the project is categorically exempt from CEQA's environmental review requirements under the in-fill (or Class 32) development exemption. They contend that because the project will result in significant effects related to traffic safety in the adjacent subdivision due to increased traffic on the private road connecting the subdivision to the project site, the City improperly found that the project is exempt from CEQA. Plaintiffs add that the City erred in determining the "unusual circumstances" exception to the in-fill exemption did not apply.

### A. *Relevant Legal Principles and Standard of Review*

To ensure that environmental considerations inform a public agency's decisions, CEQA establishes a three-tier environmental review process. (*Muzzy Ranch Co. v. Solano County Airport Land Use Com., supra*, 41 Cal.4th at pp. 379-380; *Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 409.) As relevant here, at the second step, the agency must decide whether the project falls under an exemption that renders CEQA compliance unnecessary. (See *Holden*, at p. 409.)

The categorical exemptions are set forth in section 21084, which mandates that the Guidelines "shall include a list of classes of projects that have been determined not to have a significant effect on the environment." (§ 21084, subd. (a).) The Guidelines include 33 such categorical exemptions.

The in-fill (or Class 32) exemption is set forth in Guidelines section 15332. It exempts "projects characterized as in-fill development meeting the conditions described in this section"; of the five conditions set forth, only one is at issue here. That condition, set forth in subdivision (d), requires that "[a]pproval of the project would not result in any

significant effects relating to traffic, noise, air quality, or water quality." (CEQA Guidelines, § 15332(d).)

A public agency's determination that a particular project is exempt from compliance with CEQA's environmental review requirements is subject to judicial review under the abuse of discretion standard in section 21168.5. (*Protect Tustin Ranch v. City of Tustin* (2021) 70 Cal.App.5th 951, 960.) An abuse of discretion is established if the agency has not proceeded in a manner required by law or its determination or decision is not supported by substantial evidence. (§ 21168.5; *Protecting Our Water, supra,* 10 Cal.5th at p. 495.)

"When [a public] agency concludes an activity is exempt based on factual considerations, a court reviews for substantial evidence. If the agency's determination 'involves pure questions of law, we review those questions de novo.' " (*Protecting Our Water, supra,* 10 Cal.5th at p. 495.) "The lead agency has the burden to demonstrate that a project falls within a categorical exemption and the agency's determination must be supported by substantial evidence. [Citation.] Once the agency establishes that the project is exempt, the burden shifts to the party challenging the exemption to show that the project is not exempt because it falls within one of the exceptions listed in Guidelines section 15300.2." (*Citizens for Environmental Responsibility v. State ex rel. 14th Dist. Ag. Assn.* (2015) 242 Cal.App.4th 555, 568.)

A project that falls within one of the categorical exemptions is deemed to be exempt from CEQA, unless an exception set forth in the Guidelines applies. (Guidelines, § 15061, subd. (b)(2).) One of these exceptions, the "unusual-circumstances exception," provides that "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) The plain language of this provision "requires that a potentially significant effect must be 'due to unusual circumstances' for the exception to apply. The requirement of unusual circumstances

recognizes and gives effect to the Secretary's[14] general finding that projects in the exempt class typically do not have significant impacts." (*Berkeley Hillside, supra,* 60 Cal.4th at p. 1105.)

"As to projects that meet the requirements of a categorical exemption, a party challenging the exemption has the burden of producing evidence supporting an exception." (*Berkeley Hillside, supra,* 60 Cal.4th at p. 1105.) As relevant here, to establish that the exception applies, the party has the burden to show two elements: (1) "that the project has some feature that distinguishes it from others in the exempt class, such as its size or location," and (2) that there is "a reasonable possibility of a significant effect [on the environment] due to that unusual circumstance." (*Ibid.*) "This bifurcated approach . . . require[s] findings of *both* unusual circumstances *and* a potentially significant effect." (*Id.* at p. 1115.) Evidence that a project *may* have a significant effect is not enough to "remove it" from an exempt class that the Secretary has found do not have a significant effect on the environment. (*Ibid.*)

In deciding whether the unusual-circumstances exception applies to preclude a project from qualifying as in-fill development exempt from CEQA's environmental review requirements, we apply different standards of review. (*Berkeley Hillside, supra*, 60 Cal.4th at pp. 1114-1115.) We assess the public agency's determination on the first element--whether the project presents unusual circumstances--by applying the traditional substantial evidence standard. (*Id.* at p. 1114) As for the second element--whether there is "a reasonable possibility of a significant effect [on the environment] due to that unusual circumstance"--our "function 'is to determine whether substantial evidence support[s] the agency's conclusion as to whether' " there is a fair argument of a reasonable possibility that the activity will have a significant effect on the environment.

---

**14** Secretary of the Natural Resources Agency.

(*Id*. at p. 1115.)  If there is substantial evidence of such a reasonable possibility, then the public agency's determination that no fair argument can be made constitutes an abuse of discretion and cannot be upheld.  (*Ibid*.)

Substantial evidence includes "fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact."  (§ 21080, subd. (e)(1); see also Guidelines, § 15384, subd. (a).)  It does not include "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment."  (§ 21080, subd. (e)(2); see also Guidelines, § 15384, subd. (a).)  The Guidelines define substantial evidence as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached."  (Guidelines, § 15384, subd. (a).)  In other words, "[s]ubstantial evidence is evidence of ponderable legal significance that is reasonable in nature, credible, and of solid value."  (*Holden v. City of San Diego, supra*, 43 Cal.App.5th at p. 410.)  This standard requires the court to resolve "all conflicts in the evidence . . . in favor of the prevailing party and all legitimate and reasonable inferences are made to support the [public] agency's decision."  (*Ibid*.)

B.  *Analysis*

As previously indicated, plaintiffs' challenge to the project's initial qualification as an infill development is limited to the question of whether the approval of the project will "result in any significant effects relating to traffic, noise, air quality, or water quality."  (Guidelines, § 15332, subd. (d).)  In plaintiffs' view, the in-fill development exemption does not apply here because there is substantial evidence of a fair argument of a reasonable possibility that the project will have significant effects relating to traffic safety.  As we have set forth, *ante*, plaintiffs' concerns regarding traffic safety were originally explained to the City as predicated on the assumption that the construction of a fast-food restaurant on Parcel 3 would result in increased traffic through the subdivision

28

(via the private road--Camino Real Way), causing significant effects relating to traffic/pedestrian safety, and later the expressed concerns regarding those effects were expanded to include the project as a whole, even without the restaurant added. On appeal, plaintiffs argue mainly that the non-resident traffic coming and going from the project, i.e. the "cut-thru traffic on Camino Real Way, a private road" will lead to traffic safety concerns within the development.

We see no basis for reversal. As an initial matter, we concluded *ante* that the approved project does not include the development of Parcel 3. It follows that the approval does not include fast-food restaurant on Parcel 3. And there is no substantial evidence supporting a fair argument there is a reasonable possibility that the project-- development of Parcels 1 and 2 and no development of Parcel 3--will have significant impacts relating to transportation. The project was analyzed under the VMT standard and found to be consistent with the 2035 General Plan, including the VMT analysis included in the EIR. As set forth in the General Plan Update EIR, a project that is consistent with the 2035 General Plan (as here) does not require any further VMT analysis.

Plaintiffs do not claim the City erred in determining the project will not have significant transportation impacts under a VMT analysis, which is generally the most appropriate measure of transportation impacts under CEQA.[15] (See *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 625-626 [describing legislative change in transportation analysis from automobile delay (i.e., traffic congestion) or level of service (LOS) to VMT criteria].) Instead, plaintiffs fault

---

[15] Guidelines section 15064.3 "describes specific considerations for evaluating a project's transportation impacts" and provides that, "[g]enerally, vehicle miles traveled [VMT] is the most appropriate measure of transportation impacts." (Guidelines, § 15064.3, subd. (a).) The guideline defines VMT as "the amount and distance of automobile travel attributable to a project." (*Ibid*.) "Other relevant considerations" in determining the significance of a project's transportation impacts "may include the effects of the project on transit and non-motorized travel." (*Ibid*.)

the City for failing to analyze the project's "potentially significant impacts" related to pedestrian safety. (See § 21099, subd. (b)(3) ["This subdivision does not relieve a public agency of the requirement to analyze a project's potentially significant transportation impacts related to air quality, noise, safety, or any other impact associated with transportation"].)

According to plaintiffs, the "unusual-circumstances" exception applies, which provides that a categorical exemption such as in-fill development "shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) We do not see that the exception applies here, for the reasons that follow.

A public agency's decision that a project falls within one of CEQA's categorical exemptions (e.g., in-fill development exemption) includes an implied finding that exceptions to the categorical exemption are inapplicable. (*Respect Life South San Francisco v. City of South San Francisco* (2017) 15 Cal.App.5th 449, 457.) When (as here) "an [agency's] determination that the unusual-circumstances exception is inapplicable is implied, a court's ability to affirm is constrained. The court may affirm on the basis of the first element—which . . . asks whether the project presents any unusual circumstances—only if the court assumes that the [agency] found that there *were* unusual circumstances and then concludes that the record does not contain substantial evidence of any such circumstances. A court cannot, however, affirm on the basis of the first element by simply concluding that the record contains substantial evidence that there are *not* unusual circumstances. This is because such an approach fails to address the possibility that the [agency] thought there were unusual circumstances but concluded, under the second element, that these circumstances did not support a fair argument of a reasonable possibility of a significant environmental effect." (*Id*. at p. 458.)

"In contrast, a court need not make any assumption about what the [agency] found to affirm on the basis of the second element—which . . . asks whether there is a reasonable possibility of a significant environmental effect due to any unusual circumstances. This element presupposes the existence of unusual circumstances, and a court applies a nondeferential standard of review in considering it. Under this nondeferential standard, a court must affirm an [agency's] implied determination that the unusual-circumstances exception does not apply if it concludes that no substantial evidence in the record supports a fair argument that there is a reasonable possibility the project will have a significant effect on the environment as a result of any purported unusual circumstances the petitioner identifies." (*Respect Life South San Francisco v. City of South San Francisco, supra*, 15 Cal.App.5th at p. 458.)

Here, we need not and do not consider the first element of the unusual-circumstances test because plaintiffs have failed to cite substantial evidence that satisfies the second element of the test. That is, evidence that supports a fair argument of a reasonable possibility that the purported unusual circumstances they identified in the administrative proceedings--the placement of a fast-food restaurant adjacent to the subdivision--will have a significant effect on the environment. In plaintiffs' view, the testimony of area residents about traffic-related safety concerns within the subdivision due to increased traffic from the project is substantial evidence showing that the unusual-circumstances exception applies. We are unpersuaded, because no fast-food restaurant has been approved.

Further, addressing plaintiffs' later arguments, made in the trial court and now on appeal, and assuming that the "unusual circumstance" at issue here is the commercial development of Parcels 1 and 2 in close proximity to a residential development with a

31

private road that provides access to the commercial development,[16] there is insufficient evidence to support a fair argument that there is a reasonable possibility the approved project would have a significant effect on the environment. Although substantial evidence may include relevant personal observations of area residents on nontechnical subjects, such as *existing* traffic conditions based upon personal knowledge, argument, speculation, unsubstantiated opinions, concerns, and suspicions about a project do not rise to the level of substantial evidence necessary to support a fair argument that there is a reasonable possibility a project will have a significant effect on the environment. (See *Hilltop Group, Inc. v. County of San Diego* (2024) 99 Cal.App.5th 890, 919.) "[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts *regarding the consequences of a project* do not constitute substantial evidence." (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1369, 1417, italics added.) "Unsubstantiated opinions, concerns, and suspicions about a project, though sincere and deeply felt, do not rise to the level of substantial evidence." (*Leonoff v. Monterey County Bd. of Supervisors, supra,* 222 Cal.App.3d at p. 1352.) Thus, to meet the fair argument standard, "project opponents must produce some evidence, other than their unsubstantiated opinions, that a project will produce a particular adverse effect." (*Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 735-736.) Here, the record contains no factual foundation supporting the proposition that the approved project will create significant traffic-related safety issues for residents of the subdivision due to increased traffic on Camino Real Way from non-residents.

---

[16] On appeal, the City argues that we lack jurisdiction to "entertain" the new theories plaintiffs raised for the first time before the trial court, arguing that plaintiffs failed to exhaust their administrative remedies as to those theories. The City did not raise this objection in the trial court and we decline to consider it. Instead, we address the merits of plaintiffs' appellate contentions, which track the arguments plaintiffs made in the trial court.

There is, however, evidence supporting the conclusion that the project will *not* result in a significant increase in traffic within the subdivision by non-residents. City planning and engineering staff determined that Camino Real Way was not a likely shortcut to the project (or commercial) site due to the "circuitous route" of the road. Therefore, it was not anticipated that non-resident customers of the commercial site would use the private road. Nevertheless, the City, in approving the project, addressed the traffic-related safety concerns of the area residents by requiring Inter-Cal to install a speed bump on Camino Real Way at the western entry of the subdivision and post a sign stating that the road was a private road that could not be used by non-residents. These conditions were added after City engineering staff was apprised of the residents' concerns and reviewed the traffic circulation.

On this record, we see no abuse of discretion in the City's determination that the unusual-circumstances exception does not apply here to preclude application of the in-fill development exemption. Given our conclusions, we need not and do not address any of the other arguments raised by the parties.

**DISPOSITION**

The judgment is affirmed. The City is entitled to recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

/s/
Duarte, J.

We concur:


/s/
Mauro, Acting P.J.


/s/
Renner, J.

33